No. 71–498. OLFF *v.* EAST SIDE UNION HIGH SCHOOL
DISTRICT. 

MR. JUSTICE DOUGLAS, dissenting.

It seems incredible that under our federalism a State can deny a student education in its public school system unless his hair style comports with the standards of the school board..

Some institutions in Asia require their enrollees to shave their heads. ˙ Would we sustain that regulation if imposed by a public school?

Would we sustain a public school regulation requiring male students to have crew cuts?

The present regulation—to some at least—seems as extreme as the examples given. It provides:

> "Hair shall be trim and clean. A boy's hair shall not fall below the eyes in front and shall not cover the ears, and it shall not extend below the collar in back."

Robert Olff, a 15–year-old boy speaking through his mother, has a full panoply of constitutional rights, though he is a minor. We said in *Tinker* v. *Des Moines School Dist.*, 393 U. S. 503, 511:

> "Students in school as well as out of school are 'persons' under our Constitution. They are possessed of fundamental rights which the State must respect, just as they themselves must respect their obligations to the State."

Moreover, a parent's control over the child, though not absolute, as witness our decisions placing sanctions against child labor, is pervasive. We said in *Prince* v. *Massachusetts,* 321 U. S. 158, 166:

> "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose

> primary function and freedom include preparation for obligations the state can neither supply nor hinder. . . . And it is in recognition of this that these decisions have respected the private realm of family life which the state cannot enter."

Hair style is highly personal,[1] an idiosyncrasy which I had assumed was left to family or individual control and was of no legitimate concern to the State. It seems to me to be as much a purely private choice as was the family-student decision, sustained against a State's prohibition, to study the German language in a public school. *Meyer* v. *Nebraska,* 262 U. S. 390. That family-student right, the Court held, was included within "liberty" as the word is used in the Fourteenth Amendment. *Id.,* at 400. Opposed there—as in the present case—is the authoritarian philosophy favoring regimentation. The Court said:

> "In order to submerge the individual and develop ideal citizens, Sparta assembled the males at seven into barracks and intrusted their subsequent education and training to official guardians. Although such measures have been deliberately approved by men of great genius, their ideas touching the rela-

---

[1] Feelings run high among people concerning hair styles. Yet as Professor Chafee said:

"This breach of the peace theory is peculiarly liable to abuse when applied against unpopular expressions and practices. It makes a man a criminal simply because his neighbors have no self-control and cannot refrain from violence. The *reductio ad absurdum* of this theory was the imprisonment of Joseph Palmer, one of Bronson Alcott's fellow-settlers at 'Fruitlands,' not because he was a communist, but because he persisted in wearing such a long beard that people kept mobbing him, until law and order were maintained by shutting him up. A man does not become a criminal because some one else assaults him, unless his own conduct is in itself illegal or may be reasonably considered a direct provocation to violence." Z. Chafee, Free Speech in the United States 151–152 (1942).

tion between individual and State were wholly different from those upon which our institutions rest; and it hardly will be affirmed that any legislature could impose such restrictions upon the people of a State without doing violence to both letter and spirit of the Constitution." *Id.,* at 402.

The word "liberty" is not defined in the Constitution. But, as we held in *Griswold* v. *Connecticut,* 381 U. S. 479, it includes at least the fundamental rights "retained by the people" under the Ninth Amendment. *Id.,* at 484. One's hair style, like one's taste for food, or one's liking for certain kinds of music, art, reading, recreation, is certainly fundamental in our constitutional scheme—a scheme designed to keep government off the backs of people.[2] That is not to say that the police power of the state is powerless to deal with known evils. An epidemic of lice might conceivably authorize a shearing of locks. Other like crises might be imagined. But I see no way of allowing a State to set hair styles for patrons of its schools, any more than it could establish a welfare system only for men with crew cuts and women with bobbed

---

[2] "This Court takes judicial notice that hairstyles have altered from time to time throughout the ages. Samson's locks symbolically signified his virility. Many of the Founding Fathers of this country wore wigs. President Lincoln grew a beard at the suggestion of a juvenile female admirer. Chief Justice Hughes' beard furnished the model for the frieze over the portico of the Supreme Court of the United States proclaiming 'equal justice under law.' Today many of both the younger and older generations have avoided the increased cost of barbering by allowing their locks or burnsides to grow to greater lengths than when a haircut cost a quarter of a dollar.

"Whether hair styles be regarded as evidence of conformity or of individuality, they are one of the most visible examples of personality. This is what every woman has always known. And so have many men, without the aid of an anthropologist, behavioral scientist, psychiatrist, or practitioner of any of the fine arts or black arts." *Richards* v. *Thurston,* 304 F. Supp. 449, 451.

hair.[3] Once these lines are drawn, a serious question of equal protection of the law is raised.[4]

The federal courts are in conflict and the decisions in disarray.[5] We have denied certiorari where the lower

[3] In the 1920's the fad turned to short hair:

"To conservatives, short-haired women were as much 'radicals and freaks of society' as long-haired musicians, artists, and anarchists. Some saw in bobbed hair a symbol of all the ills of the age, ranging from jazz, short skirts, sexy movies, the automobile, and prohibition to such threats as 'Freudian psychology' and the 'growing cult of the so-called free woman.' The boyish bob, followed by the shingle and bingle which shaved the nape of the neck, and then by the curly bob and spit curls, were all part of what the older generation denounced as 'Flaming Youth.'

"Preachers took to pulpits to warn that 'a bobbed woman is a disgraced woman.' In a Missouri courtroom, a mother pleading for the return of her six children who had been living with a guardian heard the oldest of them testify to the judge: 'We don't believe mother is a Christian woman. She bobs her hair.' Men divorced their wives over bobbed hair. Other males banded together with vows to give up shaving until wives agreed to let their hair grow out again. A large department store fired all bobbed haired employees and a hospital discharged bobbed haired nurses." W. Severn, The Long And Short of It 122 (1971).

[4] In *Ho Ah Kow* v. *Nunan*, 12 Fed. Cas. 252, an alien Chinese was allowed to recover damages under the Civil Rights Act against the sheriff of San Francisco for cutting his hair "to an uniform length of one inch from the scalp" on entering a prison to serve a five-day sentence for a petty offense. The Circuit Court, speaking through Mr. Justice Field, held that the ordinance made an invidious discrimination against the Chinese ("only the dread of the loss of his queue will induce a Chinaman to pay his fine," *id.*, at 255) and was a cruel and unusual punishment. *Ibid.*

[5] "Long hair" cases have occasioned a deep division in the circuits. There is a conflict as to the extent that a student's interest in his hair style enjoys constitutional protection, compare *Breen* v. *Kahl*, 419 F. 2d 1034 (CA7 1969), and *Richards* v. *Thurston*, 424 F. 2d 1281 (CA1 1970), with *Ferrell* v. *Dallas Ind. School Dist.*, 392 F. 2d 697 (CA5 1968), and *Jackson* v. *Dorrier*, 424 F. 2d 213 (CA6 1970). Where it has been found to exist, there is a split as to the constitutional basis for such protection. Compare *Breen, supra,* with

court has sustained the school board [6] and also where it has overruled the board.[7] The question tendered is of great personal concern to many and of unusual constitutional importance which we should resolve. I would grant this petition and set the case for argument.

---

*Richards, supra.* And there is a conflict as to the showing necessary by the school board to justify a hair regulation even among those circuits permitting such a justification. Compare the decision of the Ninth Circuit in the present case, and its companion, *King* v. *Saddleback Jr. College. Dist.,* 445 F. 2d 932 (1971), with *Griffin* v. *Tatum,* 425 F. 2d 201 (CA5 1970).

Not only is the conflict deep and irreconcilable, but the issue is a recurrent one. There are well over 50 reported cases squarely presenting the issue, students having won in about half of them. In addition to the 37 cases cited in Note, 84 Harv. L. Rev. 1702, 1703 n. 4 (1971), see, *e. g., King* v. *Saddleback Jr. College Dist., supra; Valdes* v. *Monroe County Bd. of Public Instruction,* 325 F. Supp. 572 (SD Fla. 1971); *Axtell* v. *LaPenna,* 323 F. Supp. 1077 (WD Pa. 1971); *Parker* v. *Fry,* 323 F. Supp. 728 (ED Ark. 1971); *Alberda* v. *Noell,* 322 F. Supp. 1379 (ED Mich. 1971); *Lambert* v. *Marushi,* 322 F. Supp. 326 (SD W. Va. 1971); *Martin* v. *Davison,* 322 F. Supp. 318 (WD Pa. 1971); *Dawson* v. *Hillsborough County, Florida School Board,* 322 F. Supp. 286 (MD Fla. 1971); *Karr* v. *Schmidt,* 320 F. Supp. 728 (WD Tex. 1970); *Freeman* v. *Flake,* 320 F. Supp. 531 (Utah 1970); *Lansdale* v. *Tyler Jr. College,* 318 F. Supp. 529 (ED Tex. 1970); *Alexander* v. *Thompson,* 313 F. Supp. 1389 (CD Cal. 1970).

[6] See, *e. g., Jackson* v. *Dorrier, supra,* cert. denied, 400 U. S. 850.
[7] See, *e. g., Breen* v. *Kahl, supra,* cert. denied, 398 U. S. 937.